Steven T. Lowe SBN 122208
  *steven@lowelaw.com*
Aleksandra Hilvert SBN 258463
  *aleksandra@lowelaw.com*
**LOWE & ASSOCIATES, P.C.**
11400 Olympic Blvd., Suite 640
Los Angeles, CA 90064
Telephone: (310) 477-5811
Facsimile: (310) 477-7672

Attorneys for Plaintiff,
**DOUGLAS JORDAN-BENEL**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **DOUGLAS JORDAN-BENEL,** an individual, <br><br> Plaintiff, <br> v. <br><br> **UNIVERSAL CITY STUDIOS, INC.,** a Delaware corporation; **UNITED TALENT AGENCY, INC.,** a California corporation; **BLUMHOUSE PRODUCTIONS, LLC**, a Delaware Limited Liability Company; **OVERLORD PRODUCTIONS LLC**, a California Limited Liability Company; **PLATINUM DUNES PRODUCTIONS**, a California Corporation; **WHY NOT PRODUCTIONS, INC. d/b/a WHY NOT FILMS**, a Nevada Corporation; **MEDIA RIGHTS CAPITAL II, LP**, a Delaware Limited Partnership; **JAMES DEMONACO**, an individual, and DOES 1 to 50, inclusive, <br><br> Defendants. | **CASE NO.: 14-5577** <br><br> **COMPLAINT FOR DAMAGES FOR:** <br><br> 1. **COPYRIGHT INFRINGEMENT;** <br> 2. **COPYRIGHT INFRINGEMENT;** <br> 3. **BREACH OF IMPLIED-IN-FACT AGREEMENT; AND** <br> 4. **DECLARATORY RELIEF.** <br><br> **DEMAND FOR JURY TRIAL** |

PLAINTIFF in the above-captioned action hereby alleges as follows:

## PARTIES

1. At all times mentioned herein, Plaintiff DOUGLAS JORDAN-BENEL ("Plaintiff") was and is an individual residing in Ulster County, New York, and the sole author of a wholly original screenplay entitled "Settler's Day" ("Settler's Day"). Plaintiff is an avid and successful writer, having penned the screenplay "Barry" purchased by Millbrook Pictures (producers of Oliver Stone's "W." and David Cronenberg's "A Dangerous Method") as well as numerous other screenplays (including screenplays developed for production by European film boards), teleplays, and comic books. At all times mentioned herein, Defendant UNIVERSAL CITY STUDIOS, INC. ("Universal") (also known as Universal Pictures) is a for-profit corporation fully owned by Comcast through its wholly owned subsidiary NBCUniversal. Universal is qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Delaware. Universal has its principal place of business in Universal City, California.

2. At all times mentioned herein, Defendant UNITED TALENT AGENCY, INC. ("UTA") is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. UTA has its principal place of business in Los Angeles, California.

3. At all times mentioned herein, Defendant BLUMHOUSE PRODUCTIONS LLC ("Blumhouse Productions") is a limited liability company qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Delaware. Blumhouse Productions has its principal place of business in Los Angeles, California.

4. At all times mentioned herein, Defendant OVERLORD PRODUCTIONS LLC ("Overlord Productions") is a limited liability company

qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. Overlord Productions has its principal place of business in El Segundo, California.

5. At all times mentioned herein, Defendant PLATINUM DUNES PRODUCTIONS ("Platinum Dunes") is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. Platinum Dunes has its principal place of business in Beverly Hills, California.

6. At all times mentioned herein, Defendant WHY NOT PRODUCTIONS, INC. doing business in California as WHY NOT FILMS ("Why Not Films") is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Nevada. Why Not Productions has its principal place of business in Henderson, Nevada and operates an office in Los Angeles, California.

7. At all times mentioned herein, Defendant MEDIA RIGHTS CAPITAL II, L.P. ("Media Rights") is a limited partnership qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Delaware. Media Rights has its principal place of business in Los Angeles, California.

8. Upon information and belief, at all times mentioned herein, Defendant JAMES DEMONACO ("DeMonaco") is an individual doing business in Los Angeles, California.

9. Defendants Universal, UTA, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, Media Rights, and DeMonaco shall be collectively referred to as "Defendants".

10. Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such

Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

11. Plaintiff is informed and believes and on that basis alleges that Defendants at all times relative to this action, were the agents, servants, partners, joint venturers and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all of the other conspirators.

## JURISDICTION AND VENUE

12. This action arises under the Copyright Laws of the United States (Title 17, U.S.C. §101 *et seq.*) and the common law of the State of California.

13. This court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

14. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of Los Angeles, State of

California.

## THE FACTS

15. Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 14 as through fully set forth herein.

16. In or about January of 2011, Plaintiff authored the wholly original screenplay entitled, "Settler's Day" (the "Screenplay"). Thereafter, on February 1, 2011, Plaintiff registered the Screenplay with the Writers Guild of America ("WGA") (a true and accurate copy of the same is attached hereto as **Exhibit A**) and on October 1, 2013, registered the same with the U.S. Copyright Office, registration no. PAu 3-691-720 (a true and accurate copy of the same is attached hereto as **Exhibit B**).

17. At all relevant times, Plaintiff was managed by Adam Peck ("Peck") of Synchroncity Management ("Synchroncity").

18. On or about July 8, 2011, Peck submitted Plaintiff's Screenplay to both David Kramer ("Kramer") and Emerson Davis ("Davis") of United Talent Agency ("UTA"). The purpose of said submission was for consideration for the production of a movie or a television series.

19. Thereafter, on or about July 13, 2013, Davis stated in an email that he had read Plaintiff's Screenplay but that he "had a difficult time buying into the premise of Settler's Day". A true and accurate copy of the same is attached hereto as **Exhibit C**. In essence, Davis stated he was going to "pass" on Plaintiff's Screenplay. Kramer of UTA was also a recipient of this email.

20. Kramer is the Managing Director of Feature Productions of UTA. Plaintiff is informed and believes and thereon alleges that Kramer directly supervises both Davis and Charlie Ferraro ("Ferraro"), another UTA literary agent.

21. The Settler's Day Screenplay remained within UTA as Davis did not state he would destroy.

22. On or about June 7, 2013, Defendants released a new feature film entitled, "The Purge" ("The Purge") containing *inter alia* the same, core copyrightable expression as Plaintiff's Screenplay in addition to numerous other similarities in the selection and arrangement of copyrightable and non-copyrightable elements.

23. Plaintiff also discovered that DeMonaco is credited as the sole writer of The Purge. DeMonaco is, and at all times was, represented by Charlie Ferraro of UTA ("Ferraro").

24. Upon information and belief, UTA had transmitted the Settler's Day screenplay to DeMonaco and thereafter "packaged" The Purge and received a packaging fee thereby.

25. In an interview published on or about May 8, 2013 on Bloody Disgusting, DeMonaco credits the following films as having inspired him to write The Purge: "*Dog Day Afternoon*", "*Straw Dogs*", and "*Escape from New York*".

26. In an interview published on or about June 5, 2013 on Defendant Blumhouse Productions' website, DeMonaco states that the inspiration for The Purge came from watching the news in Canada.

27. In the same interview, DeMonaco then shifts gears and states that "several years later", his wife inspired him to write The Purge after a road rage incident in New York City.

28. In yet another interview published on or about June 6, 2013 in the Badass Digest DeMonaco indicated that he was influenced by *both* Star Trek episode entitled, "Return of the Archons" as well as "Battle Royale".

29. Furthermore, according to DeMonaco in another published interview dated July 22, 2013 in the Inquirer Entertainment DeMonaco claims that the inspiration for the story came from watching the news while he was living in France. He stated that he "noticed the difference in the depiction of violence in

news programs there from what [he] normally [saw] in the United States. As a result, [he] wrote a story of what America would be like in the future with its inclination for violence."

30. DeMonaco claims the script for The Purge took him and his producing partner, Sebastien Lemercier, three years to pen.

31. Davis and Kramer are closely aligned to Ferraro as is evidenced by the fact that the parties worked together on feature film projects including "The Hitman's Bodyguard", "Inside the Machine", and others.

32. Settler's Day was received by DeMonaco's agency, which in the entertainment industry, is receipt by DeMonaco. In the alternative, Settler's Day was given to DeMonaco by Kramer, Davis and/or Ferraro. DeMonaco then copied from it for his own financial gain.

33. According to Prof. Richard Walter of the University of California, Los Angeles Film School ("Walter"), the similarities between Settler's Day and The Purge are so striking that it is a virtual impossibility that the former could have been created independently from the latter, including, but not limited to, the following:

(a) Theme:

    i. Both works share the same exact theme: law and lawlessness; as well as patriotism in a dystopian society where, every year, for a day or part of a day, all crime is legal – including murder.

    ii. Both works share the same sub-theme of socio-economic class envy.

    iii. In both works, governing entities preach that during this regularly scheduled, officially sanctioned orgy of bloodletting the citizenry "purges" those aspects of the human condition that are lethal. By engaging in this ritual, the authorities aver it will ensure that the rest

of the year society is both orderly and serene. Both works also fall into the Thriller and Action categories.

    iv. Finally, there is a recurring theme of revenge in both works.

(b) <u>Setting</u>:

    i. Both works take place in the near future in isolated, rural/suburban environments.

    ii. Both works unfold in the same specific arena – inside and outside a fortified residence where the progatonist family comes under siege.

    iii. Both works juxtapose the experience of the poor and wealthy on the night of legalized killing; in both works, the poor are forced to crudely board up their homes, while wealthy citizens have high-tech security systems or security personnel at their disposal for their protection.

(c) <u>Plot (see also, Sequence of Events)</u>:

    i. The plot in both works is also virtually identical: a family must withstand a siege of its fortified home on the one night of the year that killing is legal.

    ii. The same fundamental motive drives the action in both works: revenge is sought on the one night of the year when killing is legal.

    iii. In both works, the siege of the protagonists' home revolves around the antagonists' demands that the person responsible for the death of one of their own be sent out as a sacrifice, otherwise all will be killed.

    iv. In both works, the period for legalized killing commences at nightfall, having been immediately preceded by the disruption of regular TV programming schedules, in favor of speeches and announcements provided by government functionaries.

    v.   In both works, even as killing is legalized, certain weapons are disallowed.

(d) <u>Sequence of Events</u>:

    i.   The sequence of events in both works is also near-identical. Both have an implied "back story" wherein, over a period of years prior to the start of the narrative, there reigned a dystopian era marked by anarchy, chaos, and violence. Supporters of governmental authority concluded that by rendering life tolerable the rest of the year, the annual crime fest actually reduced bloodshed overall.

    ii.   In both works, the story begins the same way: from the viewpoint of the protagonist father character at a point before the killing holiday commences.

        A. Early in both works, the father characters are shown driving in their cars and listening to media advertising that promotes the "holiday".

        B. Early in both works, the father characters are depicted talking about or experiencing holiday traffic and last minute security checks.

        C. Upon returning to their homes, the father characters, along with the rest of their family, are bombarded by more media promotion for the "holiday" on the television, suggesting that it is good to partake in the bloodletting. In both cases, the announcements are expressed in an upbeat, cavalier, perhaps even boastful tone rather than a somber, sober one.

    iii.   In a strange "coincidence", both works feature the protagonists receiving holiday gifts and celebrating by consuming sweet baked goods.

iv. The two works also feature entire sequences in which the families ritualistically lock down their homes, thereby creating a fortress that is intended to protect them and to save their lives. In both, the protagonists choose to remain hunkered down in their homes throughout the movie.

  I. As part of this sequence in both works, the protagonist family is depicted as watching television while regularly scheduled programmed is preempted for a government announcement which declares the "official start" of the period for legalized killing.

  II. As part of this sequence in both works, the family is shown as engaging in a brooding vigil in which each of the individual family members are rendered as withdrawn and growing anxious over sights and sounds from outside.

  III. As part of this sequence in both works, the period for legalized killing commences with the protagonists, from the safety of their fortified homes, witnessing fellow citizens hunting down victims.

v. Both works employ the same visual device and feature action around "observation slots" cut into the barriers of the fortified home, this despite the fact that in the Defendant's work there is established sophisticated technological equipment which negates the necessity for an observation slot. In light of scenes in the Defendant's work where his characters are able to view the world outside their homes with the aid of technology, the observation slots are another unnecessary, but striking, similarity.

  I. Furthermore, in both works, there is action around an

observation slot cut specifically in the front door of the protagonists' homes. This action revolves around the protagonist father attempting to reason with the antagonists. In both cases, the scene is cut short by someone jumping out from the background and shots being fired, the effect being to scare the audience.

  II. The protagonist father character gazing out the observation slot is an image that reoccurs throughout the "Settler's Day" screenplay and, curiously, also appears in a widely circulated image featuring Ethan Hawke used to promote "The Purge."

vi. Both works also "coincidentally" contain smiley/happy faces to convey a sense of mirth associated with the killing. In Settler's Day it is a gun slot shaped like a smiley face; in The Purge it is the mask worn by an antagonist. As a testament to the importance of this image, it also appears on The Purge movie poster art and DVD packaging.

vii. In both works, there are scenes in which the protagonists show mercy towards their oppressors.

viii. In both works, the protagonists retreat to a secret area in the house where people may hide; in one it is constructed under the house and in the other a space behind a panel along a hallway.

ix. In both works, the action moves briefly to the basement of the fortified home where the father character must fight off invaders who have slipped inside and the protagonist's child is imperiled.

x. Both narratives contain action where the antagonists use trucks to breach the defenses of the protagonists' homes.

xi. Both works also feature a scar-faced lurking character as the

individual who ultimately saves the protagonist and his family. Interestingly, in both works this character is part of an important twist of events as the viewers are led to believe that the character is an antagonist – only to be later surprised by his good faith acts towards the protagonists.

    xii. Both works end in substantially similar ways:
- I. The protagonist family survives the holiday;
- II. Corpses are strewn about the land where the protagonists' homes stand; and,
- III. Electronic news reports are tallying the body count in an informational, perhaps even jovial fashion.

    xiii. The two works also contain the same future story. At the end of both narratives the protagonists renounce the state-sanctioned violence.

(e) Characters:
- i. Both protagonists are fathers (40's) and husbands who want the same thing: to protect their family and assure their survival.
- ii. Both protagonists are also shown as verbally tangling with their daughters before battling the antagonists trying to gain entry into their home.
- iii. In both works, the lead antagonist is shown as smug, self-assured, always smirking, and out for blood. In both cases, he is the mouthpiece for an entire group of antagonists.
- iv. Both works feature a similar scar-faced character who is seen skulking about mysteriously and perhaps destructively, who is revealed ultimately to be supporting the protagonists rather than undermining them.

(f) <u>Mood and Pace</u>:
  i. Both Settler's Day and The Purge are dark; there is a general mood of foreboding, fear and dread in both.
  ii. Both also contain an air of family warmth that transforms to conflict, stress, dread, desperation and tension.
  iii. Both works are slowly, methodically, deliberately, and purposefully paced. Both then accelerate, ratcheting up the tension.
  iv. Both narratives contain essentially the same graph of rising pressure.
  v. Both take pains to establish the mood of a bona fide holiday surrounding the killing.
  vi. Both associate mirth with the violence.

(g) <u>Dialogue</u>:
  i. Both works share the same goodwill greeting of "Stay Safe" (Settler's Day) and "Safe Night" (The Purge) which is also used in each to establish the mood of the holiday.
  ii. Both works feature a scene around a dinner table wherein the children of the protagonists reveal that they've discussed, with a measure of dissent, the annual killing event at school.
  iii. In both works, the parents outwardly advise their children against dissent although they clearly harbor their own doubts about the holiday.
  iv. In both works, the lead antagonist promises the protagonists he will get inside their homes and even rape their young daughter. He also demands that they send out someone to be sacrificed or all will be killed.
  v. In both works, during the heat of the battle to protect their home,

the protagonist fathers inform their wives that the enemy might possibly use fire. In *Settler's Day*, Russ tells Kate "They're gonna burn us out." In *The Purge* Movie, James tells Mary, "They can smoke us out."

    vi. Near the climax of both works, there is a similar line about "taking turns" to deliver a killing blow to the protagonists. In *Settler's Day*, Kurt tells one of the antagonists: "We could've made them kneel. Took turns shooting them." In *The Purge* Movie, antagonist Grace tells her fellow antagonists: "I'll go first, then we'll take turns."

34. The shooting script for The Purge ("Shooting Script") also includes many striking similarities to Settler's Day which were ultimately left out of the film The Purge.

35. According to Walter, the similarities between Settler's Day and the Shooting Script are so striking that it is a virtual impossibility that the latter could have been created independently from the former. Settler's Day and the Shooting Script include all of the similarities referenced above <u>as well as</u> numerous others. The following lists some, but not all of the similarities found in both Settler's Day and the Shooting Script – which were eventually removed from the actual movie, The Purge:

    a. In both Settler's Day and the Shooting Script, a primitive weapon, an archer's bow, is utilized by an invader.

    b. In both works, raccoons are used as a harbinger of the attack on the protagonists' home.

    c. Furthermore, both works describe the deaths of key antagonists in similar language: "head exploding" and "bits of brain flying".

    d. The same sylvan, forested setting is described in both works.

    e. Both works utilize similar dialogue in expressing the conflict between

the father and his daughter.

f. Both works also refer on the same exact page (page 17) to a minor character whose last name is "Kane".

g. Both works also feature the protagonists as suffering stress caused by the barking of dogs when their house comes under attack.

h. Furthermore, both scripts contain government/corporate enforced Internet disruptions when characters are deemed to have attempted to access what is regarded as a surplus of information via the worldwide web.

# FIRST CLAIM FOR RELIEF

**(COPYRIGHT INFRINGEMENT REGARDING "THE PURGE" MOVIE)**

**(Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, Media Rights, and DeMonaco)**

36. Plaintiff repeats, alleges and incorporates by reference paragraphs 1 to 35 as though fully set forth herein.

37. In or about June of 2013, Defendants released "The Purge" crediting DeMonaco as the writer and director thereof.

38. As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay "Settler's Day," without any permission, in "The Purge."

39. Upon information and belief, Defendants have thereafter intentionally broadcast, distributed, published, and otherwise exploited The Purge without authorization, in violation of Plaintiff's rights.

40. Upon information and belief, Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

41. Upon information and belief, Defendants continue to infringe upon

Plaintiff's copyrights, causing Plaintiff irreparable injury and damage, including through cinematic sequels ("The Purge: Anarchy" is scheduled to be released in theaters July 18, 2014) and other related media (such as The Purge-themed Halloween "Scare Zones," which were featured at Universal Studios Hollywood Theme Park in 2013). Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

## SECOND CLAIM FOR RELIEF

## (COPYRIGHT INFRINGEMENT REGARDING "THE PURGE" SHOOTING SCRIPT)

**(Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, Media Rights, and DeMonaco)**

42. Plaintiff repeats, alleges and incorporates by reference paragraphs 1 to 35 as though fully set forth herein.

43. In or about June 2013, DeMonaco was credited as the writer and director of The Purge Shooting Script.

44. As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay "Settler's Day," without any permission, in the Shooting Script.

45. Upon information and belief, Defendants have thereafter intentionally broadcast, distributed, published, and otherwise exploited Shooting Script without authorization, in violation of Plaintiff's rights.

46. Upon information and belief, Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq*., entitling Plaintiff to all damages and remedies provided by the Act.

47. Upon information and belief, Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage. Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other

relief provided by the Copyright Act.

## THIRD CLAIM FOR RELIEF

## (BREACH OF IMPLIED-IN-FACT CONTRACT)

### (Against All Defendants)

48. Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 35 as though fully set forth herein.

49. Both The Purge and the Shooting Script utilized Plaintiffs' key ideas.

50. By virtue of Defendants' acceptance and utilization of Plaintiff's services and ideas, an agreement was implied-in-fact to pay Plaintiff the reasonable value of those services and to credit Plaintiff as creator and/or executive producer thereof, and to employ Plaintiff in connection therewith consistent with custom and practice in the industry.

51. Plaintiff performed all covenants and conditions required of him pursuant to said agreement. Defendants breached said agreement by utilizing and profiting from Plaintiff's ideas without compensation or credit to Plaintiff.

52. As a result of the foregoing, Plaintiff was damaged in an amount according to proof for both The Purge and the Shooting Script.

## FOURTH CLAIM FOR RELIEF

## (DECLARATORY RELIEF)

### (Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, Media Rights, and DeMonaco)

53. Plaintiff repeats, alleges and incorporate paragraphs 1 to 35 as though fully set forth herein.

54. An actual dispute and controversy now exists between the Defendants and Plaintiff as to whether Plaintiff should be entitled to compensation, and credit as writer and creator of both The Purge and the Shooting Script.

55. Plaintiff believes that he is both entitled to compensation, and credit as

writer of both The Purge and the Shooting Script.

56. Plaintiff is informed and believes and on that basis alleges, that Defendants dispute Plaintiff's contentions. Plaintiff therefore desires and requests a judicial determination and declaration of the respective rights and obligations of the parties.

WHEREFORE Plaintiff prays,

## ON THE FIRST AND SECOND CAUSES OF ACTION

1. For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner;

2. For actual damages and profits according to proof;

3. That Defendants be required to pay to Plaintiff such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiff's copyright and to account for:

    (a) All gains, profits, and advantages derived by Defendant by his or her infringement of Plaintiff's copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $5,000,000;

    (b) That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies and all plates, molds, or other matter used to make infringing copies.

4. For statutory damages, costs, and attorney fees;

5. For an accounting;

6. For costs of suit and interest;

7. For such relief as is just and proper.

## ON THE THIRD CAUSE OF ACTION

8. For damages in an amount according to proof.

## ON THE FOURTH CAUSE OF ACTION

9. For declaratory relief to credit and pay Plaintiff as a creator and executive producer of "The Purge," and to credit and pay Plaintiff as a creator and executive producer on all future broadcasts, DVD releases, licenses, etc. of "The Purge," without exclusion.

Dated: July 17, 2014

LOWE & ASSOCIATES

_____
STEVEN T. LOWE, ESQ.
Attorney for
PLAINTIFF DOUGLAS JORDAN-BENEL