Steven T. Lowe SBN 122208
*steven@lowelaw.com*
Aleksandra Hilvert SBN 258463
*aleksandra@lowelaw.com*
**LOWE & ASSOCIATES, P.C.**
11400 Olympic Blvd., Suite 640
Los Angeles, CA 90064
Telephone: (310) 477-5811
Facsimile: (310) 477-7672

Attorneys for Plaintiff,
**DOUGLAS JORDAN-BENEL**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **DOUGLAS JORDAN-BENEL,** an individual,<br><br>Plaintiff,<br>v.<br><br>**UNIVERSAL CITY STUDIOS, LLC,** a Delaware corporation; **UNITED TALENT AGENCY, INC.,** a California corporation; **BLUMHOUSE PRODUCTIONS,** LLC, a Delaware Limited Liability Company; **OVERLORD PRODUCTIONS LLC,** a California Limited Liability Company; **PLATINUM DUNES PRODUCTIONS,** a California Corporation; **WHY NOT PRODUCTIONS, INC. d/b/a WHY NOT FILMS,** a Nevada Corporation; **JAMES DEMONACO,** an individual, and DOES 1 to 50, inclusive,<br><br>Defendants. | **CASE NO.: 14-cv-05577-MWF-MRW**<br><br>**Assigned to the Hon. Michael W. Fitzgerald**<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES FOR:**<br><br>1. **COPYRIGHT INFRINGEMENT (FILM);**<br>2. **COPYRIGHT INFRINGEMENT (SCREENPLAY);**<br>3. **CONTRIBUTORY COPYRIGHT INFRINGEMENT;**<br>4. **BREACH OF IMPLIED-IN-FACT AGREEMENT; AND**<br>5. **DECLARATORY RELIEF.**<br><br>**DEMAND FOR JURY TRIAL** |

PLAINTIFF in the above-captioned action hereby alleges as follows:

**PARTIES**

1. At all times mentioned herein, Plaintiff DOUGLAS JORDAN-BENEL ("Plaintiff") was and is an individual residing in Ulster County, New York, and the sole author of a wholly original screenplay entitled *"Settler's Day"* (*"Settler's Day"*). Plaintiff is an avid and successful writer, having penned the screenplay "*Barry*" purchased by Millbrook Pictures (producers of Oliver Stone's "*W.*" and David Cronenberg's *"A Dangerous Method"*) as well as numerous other screenplays (including screenplays developed for production by European film boards), teleplays, and comic books.

2. At all times mentioned herein, Defendant UNIVERSAL CITY STUDIOS, LLC, (erroneously named as "Universal City Studios, Inc." in the Complaint and First Amended Complaint)  ("Universal") (a.k.a. "Universal Pictures") was and is a for-profit corporation fully owned by Comcast through its wholly owned subsidiary NBCUniversal.  Universal is qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Delaware. Universal has its principal place of business in Universal City, California.

3. At all times mentioned herein, Defendant UNITED TALENT AGENCY, INC. ("UTA") was and is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. UTA has its principal place of business in Los Angeles, California.

4. At all times mentioned herein, Defendant BLUMHOUSE PRODUCTIONS LLC ("Blumhouse") was and is a limited liability company qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Delaware. Blumhouse has its principal place of

business in Los Angeles, California.

5. At all times mentioned herein, Defendant OVERLORD PRODUCTIONS LLC ("Overlord") was and is a limited liability company qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. Overlord has its principal place of business in El Segundo, California.

6. At all times mentioned herein, Defendant PLATINUM DUNES PRODUCTIONS ("Platinum Dunes") was and is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of California. Platinum Dunes has its principal place of business in Beverly Hills, California.

7. At all times mentioned herein, Defendant WHY NOT PRODUCTIONS, INC. doing business in California as WHY NOT FILMS ("Why Not") was and is a for-profit corporation qualified to do business in the State of California, and is organized and existing pursuant to the laws of the State of Nevada. Why Not has its principal place of business in Henderson, Nevada and operates an office in Los Angeles, California.

8. Upon information and belief, at all times mentioned herein, Defendant JAMES DEMONACO ("DeMonaco") was and is an individual doing business in Los Angeles, California.

9. Defendants Universal, UTA, Blumhouse, Overlord, Platinum Dunes, Why Not, and DeMonaco shall be collectively referred to as "Defendants".

10. Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein

1   alleged were proximately caused by the conduct of said Defendants. Plaintiff will

2   seek to amend the complaint when the names and capacities of such fictitiously

3   named Defendants are ascertained. As alleged herein, "Defendants" shall mean all

4   named Defendants and all fictitiously named Defendants.

5        11.   Plaintiff is informed and believes and on that basis alleges that

6   Defendants at all times relative to this action, were the agents, servants, partners,

7   joint venturers and employees of each of the other Defendants and in doing the

8   acts alleged herein were acting with the knowledge and consent of each of the

9   other Defendants in this action. Alternatively, at all times mentioned herein, each

10   of the Defendants conspired with each other to commit the wrongful acts

11   complained of herein. Although not all of the Defendants committed all of the acts

12   of the conspiracy or were members of the conspiracy at all times during its

13   existence, each Defendant knowingly performed one or more acts in direct

14   furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable

15   for the acts of all of the other conspirators.

16

17   **JURISDICTION AND VENUE**

18        12.   This action arises under the Copyright Laws of the United States (Title

19   17, U.S.C. §101 *et seq.*) and the common law of the State of California.

20        13.   This court has exclusive jurisdiction over this action under 28 U.S.C.

21   §§ 1331 and 1338 in that this action involves claims arising under the Copyright

22   Laws of the United States. To the extent that this action is based on related state

23   claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

24        14.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400

25   in that Defendants transact business in the county of Los Angeles, California.

26   ///

27   ///

28

4
SECOND AMENDED COMPLAINT

## THE FACTS

15.     Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 14 as through fully set forth herein.

16.     In or about January of 2011, Plaintiff authored the wholly original screenplay entitled *Settler's Day* (the "Screenplay" or "*Settler's Day*"). Thereafter, on February 1, 2011, Plaintiff registered *Settler's Day* with the Writers Guild of America ("WGA") (a true and accurate copy of the same is attached hereto as **Exhibit A**) and on October 1, 2013, Plaintiff registered the same with the U.S. Copyright Office, registration no. PAu 3-691-720 (a true and accurate copy of the same is attached hereto as **Exhibit B**).

17.     Plaintiff is the owner of all copyright rights in and to the original creative work, *Settler's Day*, in all of its advancing, original, unique and protected permutations, and has never assigned, licensed or otherwise transferred its copyright protection to any of the Defendants, nor to any other third party.

18.     At all relevant times, Plaintiff was managed by Adam Peck ("Peck") of Synchronicity Management ("Synchronicity").

19.     On or about June 30, 2011, Peck sent an electronic mail ("email") to David Kramer ("Kramer") of UTA about Plaintiff's Screenplay.

20.     On or about July 8, 2011, Kramer emailed Peck requesting that Peck contact Emerson Davis ("Davis") of UTA to discuss Plaintiff and stating that Davis is expecting Peck's call.

21.     Plaintiff is informed and believes and thereon alleges that in or about July of 2011, Peck contacted and spoke to Davis.  During that conference, Peck requested (and received) permission to submit the Screenplay to UTA and was told to email it to both Davis and Kramer.

22.     On or about July 8, 2011, Peck submitted *Settler's Day* to both Kramer and Davis of UTA via email. The email correspondence from Peck to Kramer and

Davis (which was directed at Davis) stated, **"It was nice chatting….as discussed, I'm attaching two of [Plaintiff's] screenplays, BARRY and SETTLER'S DAY."**  A true and correct copy of this email is attached hereto as **Exhibit C**.  The purpose of said submission, which was understood by Peck (on behalf of Plaintiff) and Davis (on behalf of UTA and by extension, certain other Defendants) was for (a) UTA to represent Plaintiff in order to procure the "sale" of the Screenplay and (b) to "sell" the Screenplay to a UTA client.

23.   In light of the fact that the Screenplay was solicited by UTA, Defendants therefore had numerous opportunities to reject the submission of Plaintiff's Screenplay before the submission occurred.

24.   Thereafter, on or about July 13, 2011, Davis stated in an email that he had read *Settler's Day* but that he "had a difficult time buying into the premise of *Settler's Day*." A true and accurate copy of the same is attached hereto as **Exhibit C**. Davis stated he was going to "pass" on *Settler's Day*. Kramer of UTA was also a recipient of this email.

25.   Kramer is the Managing Director of Feature Productions of UTA. Plaintiff is informed and believes and thereon alleges that Kramer directly supervises both Davis and Charlie Ferraro ("Ferraro"), another UTA literary agent.

26.   Plaintiff is informed and believes and thereon alleges that Peck and UTA also had a pre-existing business relationship on various entertainment-related projects involving clients of Peck.  For example, Plaintiff is informed and believes and thereon alleges that Peck's client Brett Paesel was represented in a deal which UTA brokered.

27.   Furthermore, Plaintiff is informed and believes and thereon alleges that UTA represents Peck's wife, Jenny Bicks, who is a showrunner, producer and screenwriter.

28.   Plaintiff is informed and believes and thereon alleges that based upon

custom and practice in the entertainment industry and the prior dealings between Peck and UTA, that UTA knew Plaintiff's submission was not gratuitous and was made for the purpose of selling the Screenplay and this was impliedly understood (as revealed by the surrounding circumstances).

29.    *Settler's Day* remained within UTA as Davis did not state he would destroy or return the copy of *Settler's Day,* which UTA possessed.  To Plaintiff's knowledge, *Settler's Day* was never returned by UTA.

30.    On or about June 7, 2013, Defendants released a new feature film entitled, "The Purge" (*"The Purge"*) containing *inter alia* the same copyrightable expression as *Settler's Day* in addition to numerous other similarities in the selection and arrangement of both protected and non-protected elements.

31.    DeMonaco is credited as the sole writer of *The Purge*. DeMonaco is, and at all times was, represented by UTA.

32.    Plaintiff is informed and believes and thereon alleges that UTA transmitted the *Settler's Day* Screenplay to DeMonaco, "packaged" *The Purge* and thereafter, upon information and belief, received a packaging fee thereby.

33.    Universal, Blumhouse, Overlord, Platinum Dunes, and Why Not all produced *The Purge*. Overlord allegedly owns the copyright to *The Purge*, and Universal additionally served as the film's distributor.

34.    In an interview published on or about May 8, 2013 on Bloody Disgusting's website, DeMonaco credits the following films as having inspired him to write The Purge: *"Dog Day Afternoon"*, *"Straw Dogs"*, and *"Escape from New York"*.

35.    In yet another interview published on or about June 5, 2013 on Defendant Blumhouse's website, DeMonaco states that the inspiration for *The Purge* came from watching the news in Canada. In the same interview, DeMonaco then shifts gears and states that "several years later", his wife inspired him to write

*The Purge* after a road rage incident in New York City.

36.   In yet another interview published on or about June 6, 2013 in the Badass Digest, DeMonaco indicated that he was influenced by both a Star Trek episode entitled "Return of the Archons" as well as "*Battle Royale*".

37.   In yet another interview dated July 22, 2013 in Inquirer Entertainment, DeMonaco claims that the inspiration for the story came from watching the news while he was living in France. He stated that he "noticed the difference in the depiction of violence in news programs there from what [he] normally [saw] in the United States. As a result, [he] wrote a story of what America would be like in the future with its inclination for violence."

38.   DeMonaco claims the script for *The Purge* took him and his producing partner, Sebastian Lemercier ("Lemercier"), three years to pen.   Plaintiff is informed and believes that Lemercier owns Why Not Productions and that Lemercier is represented by UTA.

39.   Davis and Kramer are closely aligned to Ferraro as is evidenced by the fact that the parties worked together on feature film projects including, without limitation, *"The Hitman's Bodyguard", "Inside the Machine", "Infiltrate", "Outside The Wire", "Snabba Cash Sequel", "The Cellar"* and others.

40.   *Settler's Day* was received by DeMonaco's agency, which in the entertainment industry, is receipt by DeMonaco. *Settler's Day* was given to DeMonaco by Kramer, Davis and/or Ferraro. DeMonaco then copied from it substantially.

41.   In the alternative, Plaintiff is informed and believes and thereon alleges that Defendants accessed and copied from *Settler's Day* via another   route of access.   On or about February 2, 2011, Plaintiff electronically submitted *Settler's Day* to Ken F. Levin ("Levin"), a literary agent.   Plaintiff is informed and believes and thereon alleges that Levin has and had a preexisting working

relationship with Defendant Universal and Michael Bay ("Bay"), who is the owner of Defendant Platinum Dunes.  Therefore, in the alternative, Defendants accessed *Settler's Day* through Universal/Platinum Dunes as early as February 2011.

42.     The similarities between *Settler's Day* and *The Purge* are so striking that it is a statistical impossibility that the former could have been created independently from the latter. These similarities include, but are not limited to, the following:

A. **Theme**:

    1)   Law and Lawlessness

        a)   Both works revolve around a yearly event during which, for one day or less, citizens are invited to ignore the law and indulge in almost any crime they please, including murder.

        b)   Governing authorities preach that this regularly scheduled, officially sanctioned bloodletting allows its citizens to purge the more lethal aspects of their human condition.

    2)   Class Envy

        a)   Both works portray the upper classes of society as not merely unaffected by the event, but so above the fray as to hold gatherings observing - indeed celebrating - the horrific, violent enterprise, in the vein of an Oscar party.

        b)   Both works contrast the safety and security of the privileged upper classes with the comparatively primitive attempts of poorer citizens to defend themselves during the event with boarded-up houses and unsophisticated weaponry.

    3)   Revenge

        a)   Both works have the protagonists fending off attackers not merely fueled by the socioeconomic motivation of class

envy, but the interpersonal motivation of revenge.

    b)  More specifically, both protagonist families are found to be sheltering individuals who have been targeted for retaliatory killings by others participating in the event, thereby coming under attack themselves for protecting a desired victim.

4) Patriotism

    a)  In both works, the authorized period of killing is presented as something that the host nation's citizens are intended to appreciate for purportedly bringing them out of economic and social duress. As such, the government uniformly impresses upon them the importance of their participation in the lawlessness, as if it were no less than a civic duty.

    b)  Both works express the theme of patriotism with increasing levels of dissonance over the course of their narrative arcs. The protagonists become increasingly disillusioned over the course of the event and start to question the utility of state-sanctioned civic violence, ultimately renouncing it.

B. **Setting**:

1) Both tales take place in the near future and in environments that are isolated, rural/suburban, and lush with greenery.

2) Both works unfold in the same arena: inside and outside a fortified residence where the protagonists' family comes under siege.

    a)  Notably, both protagonists' homes have "observation slots" cut into their protective barriers, even though the protagonist in *The Purge* owns a high-tech security system that renders such slots unnecessary in the context of its setting.

3) In both stories, the similarities in setting are used to raise the same

thematic socio-economic issues that also affect character and plot.

    a)  In *Settler's Day,* the poor cobble together slapdash, homemade wooden barriers to fortify their homes, whereas the wealthy are protected by upscale security systems and trained security personnel. In *The Purge,* the wealthy protagonists utilize a "high-tech" security system (which protects them in substantially the same manner as the fortifications described in *Settler's Day*) while the poor are shown as meagerly and primitively boarding up.

C. **Plot** (*see also*, Sequence of Events):

    1)  Both works revolve around one family's attempt to survive an annual, state-sanctioned ritual of temporary, consequence-free crime by taking shelter in their fortified homes and warding off intruders, who are motivated by revenge or socioeconomic envy.

        a)  In both works, the period for legalized killing commences at nightfall, having been preceded by the disruption of TV program schedules, as well as speeches and announcements provided by apparent government functionaries.

        b)  The home in *Settler's Day* is described as wearing "a suit of armor," while in *The Purge*, the house dons something very much resembling a suit of armor; steel-like plates that descend mechanically over the building's apertures.

    2)  Both works feature antagonists gathering outside the protagonists' homes demanding that a person who killed one of the antagonists' own be sent out to be sacrificed, or else they will all be killed.

        a)  This "standoff" between the characters greatly amplifies the dramatic tension in both of the works.

3)  In *Settler's Day,* emergency services such as police and ambulances are in "stand down" mode during the killing period. *The Purge* takes full advantage of this concept, even incorporating it into poster art featuring a red circle with a white cross in the center and a diagonal black slash bisecting it, accompanied by the words "Reminder: All Emergency Services Will Be Suspended."

D. **Sequence of Events**:

1)  Both works share a substantially similar back-story.

    a)  Governmental authorities, trying to stave off widespread economic unrest and violent civil disobedience, have established an annual crime fest as a means of purging its citizens' baser instincts.

2)  Both works open from the protagonist father's point of view.

    a)  Russ (*Settler's Day*) and James (*The Purge*) are both shown driving through town just before the event is scheduled to commence, listening to media promotion of the annual killing spree over their car radios.

3)  Both works feature continuous public announcements regarding the event presented in a dissonantly casual or upbeat manner.

    a)  *E.g.,* at the protagonists' homes, media hype regarding the killing of people is seen and heard on television.

4)  Both works treat the killing event as some sort of "holiday."

    a)  The protagonists receive holiday gifts as goodwill gestures and exchange goodwill greetings ("Stay Safe" in *Settler's Day*, and "Safe Night" in the *The Purge*).

    b)  The protagonist's family is shown gathering around the dinner table, discussing the legitimacy of the killing event

before it takes place, as though it were Thanksgiving.

    1.  The children mention that they discussed the holiday at school, where doubts were raised as to its true purpose.

  c)  Later on in both works, it becomes clear that the holiday has an ulterior motive, which is to cull the population and remove those who are considered to be burdens.

5)  Both works devote a large segment of screen time to the protagonists ritualistically locking down their fortified homes and mentally preparing themselves before the official start of the event. The sequence of this process in both works is as follows:

  a)  a brooding last supper consumed by the family;

  b)  moving about the house doing last-minute security checks;

  c)  watching television, on which programming is interrupted by the government's announcement of the event's start time;

  d)  engaging in a group vigil;

  e)  witnessing neighbors joining in the killing spree;

  f)  becoming unnerved by sights and sounds from outside the house until the violence explodes at their home.

6)  Both works' governing authorities disallow certain weapons from being used during the event, even as most crime is made legal.

7)  Both works depict the onset of the event from the protagonists' perspective as they witness their fellow citizens hunting one another down outside from the relative safety of their fortified homes.

8)  Both works depict the protagonists showing mercy towards their oppressors, refusing to kill a number of antagonists.

9)  Both works depict the protagonist fathers communicating with key antagonists through observation slots in their homes' front doors.

a) In both, the father attempts to reason with the antagonist to end the siege of his home.

b) In both, the interaction is cut short after another antagonist leaps out from the background and gunshots are fired.

10) Both works depict an action sequence involving a secret, concealed area where people in the house may hide: an underground tunnel in *Settler's Day,* a hidden panel in the hallway of *The Purge.*

a) Both also stage an action sequence in the basement, where the father must fend off invaders who have managed to penetrate the home's defenses while a child is in danger.

11) In both works, the action rises when the antagonists use vehicles to attack the protagonists' homes in an attempt to gain access to it.

12) Both works climax in substantially similar fashion.

a) A mysterious scarred character, who has been lurking in the area and presumed to be an antagonist, reveals himself as a helper of the protagonists and saves their lives.

b) As daylight returns, the grounds around the protagonists' homes lie strewn with the bodies of the antagonists as news reports give upbeat tallies of the event's death toll.

13) Both works imply the same future story.

a) At the end of each narrative, the protagonists renounce state-sanctioned violence. After the narrative's on-page or on-screen conclusions, they appear unlikely to count themselves among supporters of the continuing governmental policy.

E. **Characters**:

1) Both works revolve around a single family whose members are attempting to insulate themselves from the violence encouraged by

the event.

    a)   In each work, the central protagonist role is filled by a protective father bent not merely on defending his family (wife and children), but assuring its very survival.

    b)   Both families feature a rebellious teenage daughter who clashes with the protagonist father during the course of the event, even as they share the same goals of survival.

2)   Both works feature similar scar-faced characters.

    a)   Both are seen skulking about mysteriously (and perhaps destructively) before being ultimately revealed as not undermining, but supporting the protagonists.

3)   The lead antagonists of each work share numerous similarities.

    a)   Both are mouthpieces for a group of antagonists laying siege to the protagonists' homes, and it is they who demand that someone be sent out as a sacrifice for the families' safety.

    b)   Both are described as smug, smirking, and so self-assured that they guarantee they will eventually get into the house, even threatening to rape the families' daughters.

F.  **Mood and Pace**:

1)   Both works employ the same dark mood and pace.

    a)   Both stories resonate with a grim sense of foreboding.

    b)   Both stories reflect an air of family warmth that turns to conflict, stress, dread, desperation, and tension.

    c)   At their beginnings, both tales are slowly, methodically, deliberately, and purposefully paced in the lead-up to the killing's commencement. Both then accelerate as soon as the killing begins, ratcheting up the tension. As a result, each of

the narratives plots the same graph of rising tension.

2) Both works subvert and contrast their generally dark moods by characterizing the "event" as a holiday (and consequently creating an attitude of frivolity that associates mirth with violence).

   a) Both events employ holiday-like tropes, including goodwill greetings ("Stay Safe"/"Safe Night"), last minute shopping and preparations, gift-giving, parties and ritualistic consuming of sweet comestibles.

   b) Both works juxtapose grisly scenarios with "smiley faces" (a "gun slot" shaped like a happy face in *Settler's Day*, smiley faced-masks worn by antagonist killers in *The Purge*).

      1. As a testament to the importance of this image and underlying message, the DVD packaging and poster art for *The Purge* both feature a smiling face.

   c) Both works trivialize the violence of the event by wrapping up with electronic news reports tallying the body count in an informational, perhaps even celebratory fashion.

G. **Dialogue**:

1) Both works use similar "holiday" greetings emphasizing safety.

   a) "Stay Safe" (*Settler's Day*) and "Safe Night" (*The Purge*).

2) Both works use news reports and media announcements to promote the killing holiday with an upbeat, amiable attitude.

3) Both works depict a dialogue exchange at the family dinner table scene wherein the children of the family reveal that they've discussed, with a measure of dissent, the annual killing event at school.

   a) In both works, the parents respond by outwardly advising

their children against vocalizing such dissent despite clearly harboring their own doubts about the holiday.

4) Both works depict the protagonist fathers glibly responding to witnessing their neighbors taking part in the killing spree.

   a) In *Settler's Day*, the father remarks glibly: "Looks like someone settled their debt." In *The Purge*, the father also remarks glibly: "Looks like someone's getting ready."

5) Both works depict the protagonist fathers warning their wives that the antagonists might possibly use fire as a weapon against them.

   a) "They're gonna burn us out" (Russ to Kate in *Settler's Day*); "They can smoke us out" (James to Mary in *The Purge*).

6) Both works' antagonists (Bruce in *Settler's Day*, Polite Leader (in *The Purge*) share numerous similar lines in which they bully, promise to do harm, and even threaten to rape the protagonists' young daughter.

7) Both works feature antagonists talking about "taking turns" to deliver a killing blow to the protagonists near their climaxes.

   a) Near the finale of *Settler's Day*, Kurt tells one of the antagonists: "We could've made them kneel. Took turns shooting them." Near the finale of *The Purge* movie, antagonist Grace tells her fellow antagonists: "I'll go first, then we'll take turns."

43.    The shooting script for *The Purge* ("Shooting Script") also includes many *additional* similarities to *Settler's Day* which, although ultimately left out of the film *The Purge*, further prove that it is a statistical impossibility that *The Purge* could have been created independently from *Settler's Day*. These similarities include, but are not limited to, the following:

A. Both screenplays feature use of a primitive weapon (an archer's bow) by an invader, despite both works being set in the future.

B. Both screenplays utilize animals in an identical fashion: raccoons serve as the harbingers of the attacks on the protagonists' homes, while barking dogs serve as causes of stress to the characters during the attacks.

C. Both screenplays include authoritarian Internet disruptions that are enforced when characters are deemed to have attempted to access what is regarded as a surplus of information via the worldwide web.

D. Both screenplays similarly describe their sylvan/forested settings.

E. Both screenplays describe the deaths of key antagonists in similar dramatic language, with "head exploding" and "bits of brain flying."

F. Both screenplays feature the family daughters using similar exasperated dialogue when talking about their fathers (In *Settler's Day*: "He's always mad at me. Even when I'm doing everything he asks. What does he want from me anyway?"  In *The Purge*: "He never stops badgering me. It never stops…. No matter how good I do – it's never enough.").

44.    On July 18, 2014, Defendants released "The Purge: Anarchy" ("*Anarchy*") in theaters nationwide. *Anarchy* is a direct sequel to *The Purge* and a derivative work thereof. *Anarchy* utilizes the same basic core expression of *Settler's Day*, as well containing other similarities according to proof.

45.    In August of 2014, Jason Blum of Blumhouse announced that a third installment in *The Purge* franchise is being planned for release.

## FIRST CLAIM FOR RELIEF

## (COPYRIGHT INFRINGEMENT REGARDING "THE PURGE" MOVIES)

## (Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, and DeMonaco)

46.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 to

18
SECOND AMENDED COMPLAINT

41 as though fully set forth herein.

47.    In or about June of 2013, Defendants released "The Purge" crediting DeMonaco as the writer and director thereof, and crediting Universal, Blumhouse, Overlord, Platinum Dunes, and Why Not as producers thereof.

48.    As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay *Settler's Day*, without any permission, in *The Purge*.

49.    Upon information and belief, the named Defendants thereafter intentionally broadcast, distributed, published, sold, conveyed, and otherwise exploited *The Purge* without authorization, in violation of Plaintiff's rights.

50.    Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

51.    Upon information and belief, the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage, including through cinematic sequels (such as *Anarchy* and the recently announced third installment) and other related media (including, but not limited to, *The Purge*-themed Halloween "Scare Zones," which were featured at Universal Studios Hollywood Theme Park in 2013). Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

## SECOND CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT REGARDING "THE PURGE" SHOOTING SCRIPT)
**(Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, and DeMonaco)**

52.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 to

51 as though fully set forth herein.

53.    In or about June 2013, DeMonaco was credited as the writer and director of *The Purge*'s Shooting Script, thereafter utilized by Universal, Blumhouse, Overlord, Platinum Dunes, and Why Not to produce *The Purge.*

54.    As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay *Settler's Day*, without any permission, in the Shooting Script.

55.    Upon information and belief, the named Defendants have thereafter intentionally broadcast, distributed, published, and otherwise exploited the Shooting Script without authorization, in violation of Plaintiff's rights.

56.    Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq*., entitling Plaintiff to all damages and remedies provided by the Act.

57.    Upon information and belief, the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage. Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

## THIRD CLAIM FOR RELIEF
### (CONTRIBUTORY COPYRIGHT INFRINGEMENT)
### (Against UTA)

58.    Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

59.    On information and belief, UTA violated Plaintiff's exclusive right to prepare, exploit, distribute and publish and create motion pictures and other derivative works based upon the copyrighted works entitled *Settler's Day*.  This was done via an orchestrated, willful and malicious effort by UTA, and other

Defendants, to steal the core plot and story of Plaintiff's copyrighted expression, camouflage it, and pass it off as the script and motion picture, *The Purge*, in order to derive profits and to derive associated credits flowing from the motion picture industry.

60.   UTA had access to Plaintiff's protectable expression set forth in its copyrighted and owned works entitled *Settler's Day*, as alleged herein, which is proven by the email correspondence between Plaintiff's manager, Peck, and representatives of UTA.

61.   Upon information and belief, UTA knew or should have known of the direct infringement of the original screenplay *Settler's Day* set forth in the first claim for relief set forth herein above.  UTA had firsthand knowledge of the direct infringement of the story.

62.   UTA's dissemination of the story to the rest of the Defendants provided each of the Defendants knowledge of the story and therefore, caused the direct infringement.

63.   The infringing work, *The Purge*, was released by the Defendants involved in the distribution and exploitation of this infringing work in theaters worldwide.

64.   Upon information and belief, UTA contributed to the infringement of the copyrighted work *Settler's Day*, for their own profit and benefit.

65.   Defendants camouflaged the original *Settler's Day* screenplay.  UTA used their personal connections within the conspiracy to orchestrate the infringement and derive profits therefrom.  UTA funded, disseminated, distributed and exploited *Settler's Day* for their profit and benefit.

66.   *The Purge* is substantially similar to, if not strikingly similar to, *Settler's Day* and all of the related copyrighted, protected expression intended for use in a motion picture owned by Plaintiff.  Defendants copied material and high

quantities of Plaintiff's protectable expression found within its aforementioned copyrighted works.

67.     UTA was aware of, encouraged, aided, and benefited from infringing upon Plaintiff's copyrights related to *Settler's Day*.

68.     Upon information and belief, UTA has intentionally contributed to violation of the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq*., entitling Plaintiff to all damages and remedies provided by the Act.

## **FOURTH CLAIM FOR RELIEF**
### **(BREACH OF IMPLIED-IN-FACT CONTRACT)**
### **(Against UTA, DeMonaco, and Why Not Productions)**

69.     Plaintiff repeats, alleges and incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

70.     Both *The Purge* and the Shooting Script utilized Plaintiff's key ideas as contained in Plaintiff's Screenplay *Settler's Day*.

71.     Plaintiff disclosed *Settler's Day* to Defendants UTA, DeMonaco, and Why Not Productions for sale.

72.     Under all circumstances attending disclosure, Defendants UTA, DeMonaco, and Why Not Productions voluntarily accepted the disclosure knowing that they had an obligation to compensate and credit Plaintiff in accordance with custom and practice in the entertainment industry in the event Plaintiff's ideas were later used (*i.e.* Defendants UTA, DeMonaco, and Why Not Productions had multiple opportunities to reject Plaintiff's submission of *Settler's Day* but failed to do so).

73.     By virtue of Defendants' UTA, DeMonaco, and Why Not Productions acceptance and utilization of Plaintiff's services and ideas, an agreement was implied-in-fact to pay Plaintiff the reasonable value of those services and to credit

Plaintiff as the creator/writer (and producer) thereof, and to employ Plaintiff in connection therewith consistent with custom and practice in the entertainment industry.

74.     Plaintiff performed all covenants and conditions required of him pursuant to said agreement. Defendants UTA, DeMonaco, and Why Not Productions breached said agreement by utilizing and profiting from Plaintiff's ideas without compensation or credit to Plaintiff.

75.     As a result of the foregoing, Plaintiff was damaged in an amount according to proof for both *The Purge* and the Shooting Script.

## FIFTH CLAIM FOR RELIEF
## (DECLARATORY RELIEF)
### (Against Universal, Blumhouse Productions, Overlord Productions, Platinum Dunes, Why Not Productions, and DeMonaco)

76.     Plaintiff repeats, alleges and incorporate paragraphs 1 to 75 as though fully set forth herein.

77.     An actual dispute and controversy now exists between the Defendants and Plaintiff as to whether Plaintiff should be entitled to compensation, and credit as writer and creator of both *The Purge* and the Shooting Script.

78.     Plaintiff believes that he is both entitled to compensation, and credit as writer of both *The Purge* and the Shooting Script, as well *Anarchy* (which again credits DeMonaco as the sole author).

79.     Plaintiff is informed and believes and on that basis alleges, that Defendants dispute Plaintiff's contentions. Plaintiff therefore desires and requests a judicial determination and declaration of the respective rights and obligations of the parties.

WHEREFORE Plaintiff prays,

**ON THE FIRST, SECOND AND THIRD CAUSES OF ACTION:**

1.     For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner;

2.     For actual damages and profits according to proof;

3.     That Defendants be required to pay to Plaintiff such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiff's copyright and to account for:

(a)     All gains, profits, and advantages derived by Defendants by his or her infringement of Plaintiff's copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $5,000,000;

(b)     That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies and all plates, molds, or other matter used to make infringing copies.

4.     For statutory damages, costs, and attorney fees with respect to *The Purge: Anarchy* and any other derivative works;

5.     For an accounting;

6.     For costs of suit and interest; and,

7.     For such relief as is just and proper.

**ON THE FOURTH CAUSE OF ACTION**

8.     For damages in an amount according to proof.

**ON THE FIFTH CAUSE OF ACTION**

9.     For declaratory relief to credit and pay Plaintiff as the writer of *The*

SECOND AMENDED COMPLAINT

*Purge*, and to credit and pay Plaintiff as the writer on all future broadcasts, DVD releases, licenses, etc. of *The Purge*, without exclusion.

Dated: February 27, 2015

LOWE & ASSOCIATES, P.C.

_____
STEVEN T. LOWE, ESQ.
Attorney for
PLAINTIFF DOUGLAS JORDAN-BENEL

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: February 27, 2015

LOWE & ASSOCIATES, P.C.

/s/
_____
STEVEN T. LOWE, ESQ.
Attorney for
PLAINTIFF DOUGLAS JORDAN-BENEL

SECOND AMENDED COMPLAINT